UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

HEIDI AULD,

        Plaintiff,                              Civil Action No. 13-12078

        v.                                   Hon. Nancy G. Edmunds

COMMISSIONER OF
SOCIAL SECURITY,

        Defendant.
_____/

**OPINION AND ORDER**
**DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [10] AND**
**GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [11]**

Plaintiff Heidi Auld appeals Defendant Commissioner of Social Security's ("Commissioner") denial of her application for disability insurance benefits and supplemental security income. (*See* Dkt. 1, Compl.) This matter comes before the Court on the parties' cross-motions for summary judgment (Dkts. 10, 11). For the reasons set forth below, this Court finds that substantial evidence supports the decision of the Commissioner, finding that, at Step 5, Plaintiff was not disabled because she could perform a significant number of other jobs. The Court therefore **DENIES** Plaintiff's Motion for Summary Judgment (Dkt. 10), **GRANTS** Defendant's Motion for Summary Judgment (Dkt. 11), and, pursuant to 42 U.S.C. § 405(g), **AFFIRMS** the decision of the Commissioner of Social Security.

**I.     BACKGROUND**

Plaintiff was 37 years old on the date of her alleged onset of disability and was considered a younger individual at all relevant times. (Tr. 19.) She had a high school education and completed two years of college. (Tr. 19, 124.) Plaintiff previously worked as a controller, recruiter, loan processor, and office manager. (Tr. 19, 124.) She was diagnosed with multiple sclerosis in May 2006. (Tr. 29.) She was laid off from her last job as a technical recruiter in August 2008, collected unemployment for a little over one year, and looked for work the whole time as required by the State of Michigan. (Tr. 38-39.) She remains unemployed.

    **A.     Procedural History**

Plaintiff applied for disability insurance benefits and supplemental security income on November 16, 2010 and November 24, 2010, respectively, alleging that she became unable to work on September 1, 2008, due to multiple sclerosis. (Tr. 95-102, 123.) The Commissioner initially denied Plaintiff's disability application on February 9, 2011. (Tr. 62-70.) Plaintiff then requested an administrative hearing, and on September 15, 2011, she appeared with counsel before Administrative Law Judge Melvyn Kalt, who considered her case *de novo*. (Tr. 24-45, 71-72.) A Vocational Expert, Lawrence Zatkin, testified at the administrative hearing. (Tr. 40-44.) In a December 2, 2011 decision, the ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act. (*See* Tr. 14-20.) The ALJ's decision became the final decision of the Commissioner on March 8, 2013, when the Social Security Administration's Appeals Council denied Plaintiff's request for review. (Tr. 1-6.) Plaintiff filed this suit on July 15, 2013. (Dkt. 1, Compl.)

**B.     Medical Evidence**

On May 2, 2006, Plaintiff had an MRI of her brain. Dr. Alton Smith's impressions derived from the MRI were that there was a "slight thinning of the corpus callosum with abnormal periventricular white matter changes and abnormal signal noted within the corpus callosum" and that "[t]he findings are suggestive of a demyelinating process such as multiple sclerosis." (Tr. 174.)

A May 17, 2006 electromyography ("EMG") study indicated "no definite evidence of any radiculopathy in the tested extremities" but "[t]he presence of a central demyelinating disease like MS cannot be excluded by the above study." (Tr. 172-173.)

On July 3, 2006, Plaintiff consulted with Dr. John Kamholz, a neurologist at Harper Hospital's Neurology Department. Dr. Kamholz's Final Report provides the following under "History:"

> Ms. Auld is a 35-year old woman with a three year history of intermittent numbness of the right lower extremity constituting for evaluation and treatment of the possibility of multiple sclerosis. According to the patient, she has been fine with no medical difficulties or problems until approximately three years ago when she noted the onset of numbness in the right leg after walking approximately a mile or two. This numbness was throughout the right lower extremity and essentially resolved within several hours with rest. Since that time, the patient notes a similar episode each time she walks four to six blocks. These symptoms last hours and are usually resolved by resting. The patient also complains of urinary hesitancy and urgency which she has had for the last eight months, but does not complain of urinary tract infections. Furthermore, she complains of numbness in both hands for approximately the last year. There is no history of visual abnormalities. There are no other neurological symptoms. The patient's mother, however, has multiple sclerosis.

(Tr. 212-213.) Dr. Kamholz performed a physical exam and noted that Plaintiff did not exhibit any acute distress, her mental status was normal, her cranial nerves were "entirely within normal limits," her motor exam revealed "normal bulk and tone and 5/5 strength

throughout," her sensory exam was normal, and her coordination, gait, and station were normal. (Tr. at 213.) Under his "Assessment and Plan," Dr. Kamholz noted that "[a]lthough she has very minimal history, her MRI is very suggestive that she has multiple sclerosis. In order to more fully evaluate this problem, I have suggested to the patient to obtain a number of screening blood studies. . . .  In addition, she will undergo a spinal fluid evaluation and will return to the clinic after this has been accomplished." (Tr. 214.)

On December 4, 2006, Plaintiff had an office visit with Dr. Kamholz. (Tr. 199.) His introductory notes report that:

> Patient was last seen in neurology clinic in September, at which time she was stable and we discussed in detail the treatment for multiple sclerosis. After discussing this, the patient decided to be treated with Copaxone, and this treatment started in October 2006.  Since the patient started on this medication, she has done quite well, and there have been no specific complications or difficulties. Since the patient's last visit, there has been no urinary tract infections or any other difficulties.

(Tr. 199.)  His  physical examination notes indicate "no acute distress;" normal mental status and cranial nerves; normal motor exam "with normal bulk and tone and 5/5 strength throughout;" sensory exam "demonstrates diminished light touch in both hands, but is otherwise normal;" normal coordination, and although "some problems with her gait with tandem walking" is otherwise normal. (Tr. 199.) His notes further indicate that Plaintiff "has done well since her previous visit in September of this year;" that Plaintiff "has begun on Copaxone without any side effects, and she will return to the neurology clinic in six months' time for further evaluation and treatment." (Tr. 199.)

Plaintiff saw Dr. Kamholz twice in 2007:  on June 4, 2007 and November 29, 2007. (Tr. 197-198.)  The June 2007 treatment notes indicate that Plaintiff was still experiencing numbness in her hands, that her right leg was weaker, and that she had started walking

with a limp on the right side. (Tr. 198.) The November 2007 notes indicate that Plaintiff experienced intermittent weakness in her right leg and numbness in her hands.

After those initial two visits in 2007, Plaintiff saw Dr. Kamholz two more times: on June 12, 2008 and on November 29, 2010.

In late January 2008, Dr. Kamholz's notes indicate that Plaintiff called his office twice requesting prescriptions for Adderall. (Tr. 196.)

On June 12, 2008, Plaintiff saw Dr. Kamholz. His notes indicate that her MS was stable and that she was to continue her current medication and make another appointment in six months. (Tr. 195.) His notes further indicate that there was no significant change in Plaintiff's condition and that she experienced numbness in her hands and intermittent weakness in her right leg. (Tr. 195.)

On December 12, 2008, Plaintiff did not attend her scheduled appointment with Dr. Kamholz. (Tr. 193.)

On November 29, 2010, Plaintiff once again had an office visit with Dr. Kamholz. His notes indicate that Plaintiff had not taken her prescribed Copaxone injections for the past nine months and that she was experiencing urinary hesitancy and urgency. She also reported that she began feeling numbness on the left side of her face about one month ago and that it was still numb, that she has had numbness in her right hand and arm for the last two years, that it was difficult for her to write, and that she had decreased strength and coordination in the right leg. (Tr. 193.) Dr. Kamholtz noted that her grip was 4+/5, that her MS had not progressed, and that she needed an MRI of the brain and spine and an IVS for her face. (Tr. 194.)

On January 26, 2011, Plaintiff underwent a consultative examination with Dr. Cynthia

5

Shelby-Lane at the state agency's request in connection with Plaintiff's alleged disability due to multiple sclerosis. (Tr. 184.) Dr. Shelby-Lane's report includes Plaintiff's summary of her medical history and current symptoms:

> This 39-year-old female has a history of multiple sclerosis remitting and relapsing. She is currently on Copaxone since 2004. She states she sees her neurologist Dr. Kamholz twice a year. She states she does use a cane on occasion. She states she has chronic fatigue along with problems with balance and support. She does frequently stumble and fall.
>
> * * *
>
> The examinee states that she does have problems with prolonged standing, stooping, squatting, lifting, bending, pushing, pulling, reaching and climbing stairs. She has paresthesias of her right arm, hand, leg and foot as well her left face. She has chronic swelling and stiffness. She states that she is going to a fit program. She found a physical therapy on her own three times a week.
>
> The examinee states she also has problems with holding a pen and writing very well. She thinks that has to do with manual dexterity such as cooking, doing dishes or holding a fork. She states she cannot type with any accuracy. Her face is numb. She has severe fatigue. She can no longer operate a motor vehicle because of numbness in her right leg. She states she cannot walk without a shopping cart or a cane and has significant balance issues and unsteadiness. She states some of these problems are getting worse over time.

(Tr. 184.) Dr. Shelby-Lane's notes from Plaintiff's physical examination indicate that:

> EXTREMITIES: No obvious spinal deformity, swelling or muscle spasm noted. Pedal pulses are 2+ bilaterally. There is no calf tenderness, clubbing, edema, varicose veins, brawny erythema, stasis dermatitis, chronic leg ulcers and muscle atrophy or joint deformity or enlargement is noted.
>
> BONES AND JOINTS: The examinee does not use a cane or aid for walking. She has a slow gait and a slight limp on the right side. Tandem walk, heel walk and toe walk are done slowly while holding the table. Able to squat to 75% of the distance and recover and bend to 75% of the distance and recover while holding the table. Grip Strength - See Jamar [Tr. 191, indicating grip strength of 15KG for right hand and 25KG for left]. The examinee is right-handed. Gross and fine dexterity appear bilaterally intact. Abduction of the shoulders is 0-150. Flexion of the knees 0-150. Straight leg

> raising while lying 0-50, while sitting 0-90.
>
> NEUROLOGIC: General: The patient is alert, awake and oriented to person, place and time. Cranial Nerve II: Vision as stated in Vital Signs [Tr. 185, indicating "Without glasses, 20/30 on the right and 20/30 on the left."]. III, IV, VI: No ptosis, nystagmus. PERRLA. Pupils 2 mm. bilaterally. V: <u>No facial numbness. Symmetrical response to stimuli</u>. VII: <u>Symmetrical facial movements noted</u>. VIII. Can hear normal conversations and whispered voice. IX, X: Swallowing intact. Gag reflex intact. Uvula midline. XI: Head and shoulder movement against resistance are equal. XII: No sign of tongue atrophy. No deviation with protrusion of tongue. <u>Sensory Functions</u>: <u>Intact to sharp and dull gross testing</u>. Motor Exam: <u>Reveals fair muscle tone without flaccidity, spasticity or paralysis</u>. <u>The examinee has a slow gait and a slight limp on the right side.</u>

(Tr. 186 (emphasis added).) Dr. Shelby-Lane reported the following impressions:

> 1. MULTIPLE SCLEROSIS: The examinee has a history of multiple sclerosis diagnosed in 2004. She continues to have problems with paresthesias in the right upper and right lower extremity. She has problems with her gait being a slow gait and a limp on the right side. She states she has problems with balance as well and the problem is getting worse. She is still being seen by her neurologist and taking medication as prescribed by her neurologist. A range of motion sheet is included for your review.

(Tr. 186.)

On March 21, 2011, Plaintiff called Dr. Kamholz for an adderall prescription that she requested be mailed to her. (Tr. 192.)

  **C. Function Report Provided to Social Security Administration**

In a December 26, 2010 function report, Plaintiff reported that she could not drive or walk distances and had fatigue and trouble with writing and speaking. (Tr. 129.) She also reported that her daily activities included feeding the dog, bathing independently, preparing simple meals, doing light housekeeping, using the computer to shop for gifts and household items, paying bills, handling her bank accounts, reading, watching TV, playing

computer games, attending church, talking on the phone, and receiving visitors. (Tr. 130-33.) She used a cane but said it was not prescribed by a doctor. (Tr. 135.)

> **D.     Testimony at the Hearing Before the ALJ**
>
> *1. Plaintiff's Testimony*

At the September 15, 2011 hearing, Plaintiff testified that she had last worked in August 2008 as a technical recruiter. (Tr. 28.) She further testified that she was laid off from that position because she had been the most recently hired employee. (Tr. 29.) After being laid off in August 2008, Plaintiff collected unemployment for a little over one year, and she looked for work the whole time as required by the State of Michigan. (Tr. 38-39.)

Plaintiff was first diagnosed with multiple sclerosis (MS) in 2006. (Tr. 29.) She testified that she took a daily injection of Copaxone and initially saw her doctor twice a year but now only saw him once a year. (Tr. 32.) She further testified that, in 2008, she had trouble walking to and from her car to office, and that she had trouble using her hands to dial a phone or hold a pen, with putting on make-up or jewelry, and was dealing with incontinence and fatigue. (Tr. 32.) Plaintiff noted that she experienced more hand numbness in 2006 than she did at the time of the hearing. (Tr. 33.) Plaintiff testified that she still experienced fatigue; and, when she did, her symptoms were more pronounced, i.e., numbness in her right leg. (Tr. 33.)

At the time of the September 15, 2011 hearing, Plaintiff testified that sitting was not a problem, but she did start to feel leg numbness after sitting for too long – after about 40 minutes. (Tr. 35.) Plaintiff claimed that she could not stand without support, but testified that she did not use a cane or walker. (Tr. 35-36.) She claimed she had grip problems and that buttoning clothing or tying shoes was possible but took a long time to accomplish, and

8

her husband helped her dress. (Tr. 36.) Plaintiff testified that she was right-hand dominated but had to use her left hand for "everything." (Tr. 36.) At home, she used a vacuum cleaner and did light dusting. (Tr. 37.) She practiced yoga, but no longer drove. (Tr. 37, 38.)

### 2. The Vocational Expert's Testimony

The ALJ solicited testimony from a vocational expert ("VE") to determine whether jobs would be available for someone with functional limitations approximating Plaintiff's. The ALJ asked about job availability for a hypothetical individual of Plaintiff's age, education, and work experience who was capable of performing sedentary work as defined in the relevant regulations but could not perform work that required continuous use of the hands, or work requiring fine manipulation, or work requiring more than occasional note taking, or work requiring use of the hands on a keyboard. (Tr. 41-42.) The VE testified that, considering those factors, Plaintiff could not return to her past work but there would be other work that she could perform that are less demanding of the use of the hands but all require the use of the hands on more than an occasional basis. (Tr. 42.) When asked about sedentary jobs that require the least use of the hands, the VE responded with two jobs: surveillance monitor and information clerk. (Tr. 42-43.) The VE further testified that most of the jobs, about 800 jobs in the southeast area, are going to require access to a computer screen, and a small percentage – about 5 to 10 percent – 80 jobs maybe – will not. (Tr. 43-44.)

## II. THE ALJ'S APPLICATION OF THE DISABILITY FRAMEWORK

Under the Social Security Act, disability insurance benefits and supplemental security income "are available only for those who have a 'disability.'" *See Colvin v.*

*Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability," in relevant part, as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505 (DIB); 20 C.F.R. § 416.905 (SSI).

The Social Security regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> 1. If claimant is doing substantial gainful activity, he is not disabled.
>
> 2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.
>
> 3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.
>
> 4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.
>
> 5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997); *see also* 20 C.F.R. §§ 404.1520, 416.920. "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is not

disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

At step one, ALJ Melvyn Kalt found that Plaintiff had not engaged in substantial gainful activity since the alleged disability onset date of September 1, 2008. (Tr. 16.) At step two, he found that Plaintiff had the following severe impairments: multiple sclerosis. (*Id.*) Next, the ALJ concluded that none of these impairments, alone or in combination, met or medically equaled a listed impairment. (Tr. 16-17.) Between steps three and four, the ALJ determined that Plaintiff had the residual functional capacity to:

> perform a limited range of sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a). The claimant can lift and/or carry ten pounds occasionally and less than ten pounds frequently, stand and/or walk at least two hours in an eight-hour day, and sit about six hours in an eight-hour day. The claimant must also avoid continuous work with her hands.

(Tr. 17.) At step four, the ALJ found that Plaintiff was unable to perform any past relevant work. (Tr. 19.) At step five, the ALJ found that sufficient jobs existed in the national economy for someone of Plaintiff's age, education, work experience, and residual functional capacity. (Tr. 19.) The ALJ therefore concluded that Plaintiff was not disabled as defined by the Social Security Act from the alleged onset date through the date of his decision. (Tr. 20.)

### III. STANDARD OF REVIEW

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited: the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by

substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted).

Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider that record as a whole. *Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007); *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006). Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass*, 499 F.3d at 509; *Rogers*, 486 F.3d at 247.

**IV. ANALYSIS**

    **A.    Substantial Evidence Supports the ALJ's Residual Functional Capacity (RFC) and Credibility Findings**

The ALJ found that Plaintiff had a severe impairment: multiple sclerosis. (Tr. 16.) After careful consideration of the record, the ALJ found that Plaintiff "has the residual functional capacity to perform a limited range of sedentary work" and further found that Plaintiff "can lift and/or carry ten pounds occasionally and less than ten pounds frequently, stand and/or walk at least two hours in an eight-hour day, and sit about six hours in an eight hour day" and "must also avoid continuous work with her hands. (Tr. 17.) Plaintiff argues that the ALJ erred in failing to account for her right lower extremity limitations, fatigue, and need to use her non-dominant hand. (Dkt. 10, Pl.'s Br. at 9.) The Court agrees with the Commissioner – Plaintiff inappropriately frames this argument in terms of a faulty hypothetical but, in essence, it questions the ALJ's residual functional capacity ("RFC") and credibility findings.

The ALJ's RFC finding is based on its credibility finding. In evaluating Plaintiff's credibility, the ALJ carefully considered all of the objective medical evidence, opinion evidence, clinical findings, Plaintiff's descriptions of her symptoms and complaints, as well as the type, length, and frequency of her treatment, and other factors. (Tr. 17-19.) He considered Plaintiff's complaints of hand numbness, difficulty walking, difficulty with using her hands, and daily fatigue and found that, although Plaintiff's "medically determinable impairment could reasonably be expected to cause the alleged symptoms," Plaintiff's "statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional

capacity assessment." (Tr. 17.) Substantial evidence supports the ALJ's findings.

The ALJ correctly observed that the objective medical evidence revealed that Plaintiff had only two visits with her neurologist, Dr. Kamholz, between June 2008 and December 2, 2011. Moreover, he correctly observed that the treatment notes from those visits did not reveal any complaints of fatigue; that in June 2008, Plaintiff was taking Copaxone with no side effects and her MS was stable; that Plaintiff failed to show up for her scheduled December 2008 visit; and that Plaintiff did not see Dr. Kamholz again until November 29, 2010. (Tr. 18, 193-196.) Further, he correctly observed that at that November 2010 appointment, Dr. Kamholz noted that Plaintiff had not been taking her Copaxone for nine months and yet her physical examination showed that her MS had not progressed and that her grip had only slightly decreased, i.e., it was now 4+/5 instead of 5/5. (Tr. 18, 193-194.) This evidence supports the ALJ's finding that Plaintiff's allegations about the severity of her symptoms are not credible. So too does Plaintiff's testimony that she only saw her neurologist once a year despite his recommendation of twice yearly visits. (Tr. 18, 32, 199.) Contrary to Plaintiff's argument here that she did not see her neurologist twice a year as he recommended because she lacked health insurance, she testified at her hearing that she chose not to do so because she saw no benefit in the recommended twice a year doctor appointments. "[H]e would like me to come in once every six months or twice a year but there's no reason for it. I mean unless you have a cure for me, I'll see you next year, you know." (Tr. 32.) *See* 20 C.F.R. §§ 404.1529(c)(3); 416.929(c)(3) (credibility assessment includes consideration of treatment and medication).

Moreover, as the ALJ correctly observed, despite Plaintiff's slow gait and slight limp on the right side, at the time of her January 2011 consultive examination, Plaintiff had not

14

visited her neurologist in over a year. (Tr. 18, 186.) Furthermore, despite Plaintiff's complaints, Dr. Shelby-Lane's neurological examination revealed that there was "No facial numbness. Symmetrical response to stimuli," "Symmetrical facial movements;" that her sensory functions were "Intact to sharp and dull gross testing;" and that her motor exam "reveal[ed] fair muscle tone without flaccidity, spasticity or paralysis." (Tr. 186.) Dr. Shelby-Lane's examination of Plaintiff's bones and joints revealed that she "does not use a cane or aid for walking;" can perform "tandem walk, heel walk and toe walk" if done "slowly while holding the table;" can "squat to 75% of the distance and recover and bend to 75% of the distance and recover while holding the table;" that her "gross and fine dexterity appear bilaterally intact;" and that her grip strength was 15KG for the right hand and 25KG for the left. (Tr. 186, 191.) Plaintiff's range of motion testing was essentially normal. (Tr. 187-88.) Based on her objective examination, Dr. Shelby-Lane opined that Plaintiff could sit, stand, bend, stoop, carry, push, pull, button clothes, tie her shoes, dress and undress, make a fist, pick up a coin, write, and dial a phone, among other things. (Tr. 189.) This opinion supports the ALJ's finding that Plaintiff's testimony that she was unable to walk, dial a phone, hold a pen, or put on her make-up was not fully credible. (Tr. 17, 32.)

Despite Plaintiff's complaints to the contrary, the ALJ properly considered evidence from her earnings records showing that she had received unemployment benefits for a little over a year after she was laid off from her job in August 2008. (Tr. 18, 110-111.) The ALJ correctly observed that, in Michigan, the receipt of unemployment benefits is premised upon the applicant averring that he or she is capable of any type of work should a job be offered, and that the receipt of unemployment benefits is a factor that may be considered

15

in determining whether a claimant is disabled. (Tr. 18, 38.) *See Justice v. Comm'r of Soc. Sec.*, 515 F. App'x 583, 587 (6th Cir. 2013) (observing that unemployment benefits are conditioned on the beneficiary being able and willing to work); *Workman v. Comm'r of Soc. Sec.*, 105 F. App'x 794, 801 (6th Cir. 2004) (citing Sixth Circuit decisions and observing that "[a]pplications for unemployment benefits and disability benefits are inherently inconsistent."). *See also* 20 C.F.R. §§ 404.1512(b), 416.912(b). In response to the ALJ's question whether Plaintiff was looking for work the whole time she was collecting unemployment benefits, Plaintiff responded, "Yes, sir, I was. I was required by the State of Michigan to fill out a form of three places of employment that I had applied to, you know, to comply with receiving my benefits." (Tr. 38.) As discussed above, there is substantial evidence supporting the ALJ's RFC and credibility findings. (Tr. 18.)

### B. Substantial Evidence Supports the ALJ's Finding That Plaintiff Could Perform a Significant Number of Other Jobs

Plaintiff also argues that the VE's testimony does not provide substantial support for the ALJ's decision at Step Five, that Plaintiff could perform a significant number of other jobs, because (a) the hypothetical presented to the VE failed to include all of Plaintiff's limitations; and (b) 800 jobs in the Southeast Michigan area is not sufficiently significant. Plaintiff is mistaken. There is substantial evidence supporting the ALJ's finding that Plaintiff could perform a significant number of other jobs in the national economy, considering her age, education, work experience, and residual functional capacity.

First, for all the reasons discussed above, there is substantial evidence supporting the ALJ's finding that Plaintiff's statements about the intensity, persistence, and limiting effects of her symptoms were "not credible to the extent they are inconsistent" with the

ALJ's RFC assessment. Thus, the issue is whether hypothetical presented to the VE accurately described the limitations in that RFC. It did.

Between Steps Three and Four, the ALJ found that Plaintiff has the residual functional capacity to perform a limited range of sedentary work as defined in the regulations, and "can lift and/or carry ten pounds occasionally and less than ten pounds frequently, stand and/or walk at least two hours in an eight-hour day, and sit about six hours in an eight-hour day" and "must avoid continuous work with her hands." (Tr. 17) The ALJ asked about job availability for a hypothetical individual of Plaintiff's age, education, and work experience who was capable of performing sedentary work as defined in the relevant regulations but could not perform work that required continuous use of the hands, or work requiring fine manipulation, or work requiring more than occasional note taking, or work requiring use of the hands on a keyboard. (Tr. 41-42). The VE testified that, considering those factors, Plaintiff could not return to her past work. (Tr. 42.) When asked about sedentary jobs that require the least use of hands, the VE identified two jobs -- surveillance monitor and information clerk (Tr. 42) -- and estimated that there would be about 800 jobs in the Southeast Michigan area that would require some "access to a computer screen" and thus some use of the hands. (Tr. 44.) Contrary to Plaintiff's arguments here, the hypothetical presented to the VE accurately described her limitations and was consistent with the ALJ's RFC limitation that Plaintiff avoid "continuous work with her hands" (Tr. 17, 42); and, if anything, was more favorable physically to Plaintiff than the RFC. The VE's testimony thus provides substantial evidence to support the ALJ's finding, at Step Five, that Plaintiff was not disabled. *See Pasco v. Comm'r of Soc. Sec.*, 137, F. App'x 828, 845 (6th Cir. 2005) (holding that a hypothetical given to a VE that was different

17

than but <u>more</u> favorable physically to the plaintiff than the RFC did not constitute reversible error).

Also, contrary to Plaintiff's second argument, the VE identified 800 jobs that fit Plaintiff's RFC limitations in the Southeast Michigan area. This is a significant number of jobs. *See Martin v. Comm'r of Soc. Sec.*, 170 F. App'x 369, 376 (6th Cir. 2006) (observing that "870 jobs can constitute a significant number in the geographic region," citing *Stewart v. Sullivan*, 904 F.2d 707 (6th Cir. 1990) (unpublished table decision), where the Sixth Circuit held that "125 relevant jobs can be a significant number of jobs in that region.").

## V. CONCLUSION

For the reasons set forth above, this Court finds that substantial evidence supports the decision of the Commissioner, finding that, at Step 5, Plaintiff was not disabled because she could perform a significant number of other jobs. The Court therefore **DENIES** Plaintiff's Motion for Summary Judgment (Dkt. 10), **GRANTS** Defendant's Motion for Summary Judgment (Dkt. 11), and, pursuant to 42 U.S.C. § 405(g), **AFFIRMS** the decision of the Commissioner of Social Security.

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated: June 25, 2014

I hereby certify that a copy of the foregoing document was served upon counsel of record on June 25, 2014, by electronic and/or ordinary mail.

s/Carol J. Bethel
Case Manager